UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

LOURDES MILAN &
MARIA MAGALHAES
          Plaintiffs,

    v.                                    C.A. No. 010-119-ML

BLUE CROSS & BLUE SHIELD
OF RHODE ISLAND
          Defendant.

<u>MEMORANDUM AND ORDER</u>

The plaintiffs in this employment discrimination action, Lourdes Milan ("Milan") and Maria Magalhaes ("Magalhaes"), were, until their involuntary termination, long-term employees of the defendant Blue Cross & Blue Shield of Rhode Island ("BCBSRI"). Milan and Magalhaes seek relief under Title VII of the Civil Rights Act of 1964 for BCBSRI's alleged discriminatory employment practices on the basis of race and national origin. The matter before this Court is BCBSRI's motion for summary judgment on all counts of the complaint. For the reasons stated herein, BCBSRI's motion for summary judgment is GRANTED.

**I.   Factual Background**

Milan was born in the Dominican Republic and, at the time her employment with BCBSRI was terminated in March 2009, Milan was working in BCBSRI's Cash Receipts Department (the "Department")

1

which is responsible for processing payments to BCBSRI from its subscribers.   Def.'s Statement of Undisputed Facts ("SUF") ¶ 15. Milan, who had been employed in the Department for 15 years and most recently held the position of Senior Bookkeeper, worked as a "lead person" in the Department's processing room.  SUF ¶¶ 16-18, 20.  Although she had no authority to discipline employees, SUF ¶ 20, Milan apparently held some responsibility for getting the work in the processing room done. Milan, who speaks both English and Spanish, was, by her account, "the only Hispanic" in her department.  SUF ¶ 7, Pltfs.' Ex. 9, Docket No. 17-9.

Magalhaes, who was born in Portugal, began working at BCBSRI in September of 1985.   She too held the position of Senior Bookkeeper and was responsible for processing and balancing payments for BCBSRI's group premiums, balancing group premium income, and posting on the Department's general ledger.  SUF ¶ 26. Magalhaes has lived in the United States for more than thirty years.   Although her "first language" is Portuguese, she also speaks English and Spanish.  SUF ¶¶ 10, 12.  Magalhaes has stated that she does not consider herself "Hispanic."  SUF ¶ 11.

A.   Milan's Account

The Department consisted of approximately 14 employees, including Milan and Magalhaes. During the workday, four employees worked in the processing room at a time.  At the time in question, both Magalhaes and Milan were working in separate cubicles located

2

close to one another and near the processing room.  SUF 27.  It is undisputed that BCBSRI has adopted a harassment policy (the "Policy") that prohibits not only sexual harassment, but all types of harassment in the workplace.  SUF ¶¶ 29, 30.  Both Milan and Magalhaes received copies of the Policy in January 2005.  SUF ¶¶ 32, 33.  In addition to acknowledging receipt of the Policy, Milan and Magalhaes have indicated that they understood the Policy to prohibit all kinds of harassment.  SUF ¶¶ 35-37.

One of the employees who spent time in the processing room was S.R.,[1] who had worked for BCBSRI in the Department for approximately six or seven years at that time.  SUF ¶ 38.  S.R. is white and of Italian national origin.  SUF ¶ 39.  Some time in 2008, Milan, whose duty as "lead person" included overseeing productivity in the processing room, took issue with the number of bathroom breaks S.R. was taking during the work day.  SUF ¶ 41.  Although BCBSRI has no rules regarding the frequency or duration of bathroom breaks, Milan was concerned because she believed that S.R. was leaving work "half done" that had to be finished by other employees.  SUF ¶ 43. According to another co-worker, Donna Quinn-Bonis ("Quinn-Bonis"), Milan complained to other employees that S.R. was taking too many bathroom breaks and she began keeping track of the number of times S.R. left the processing room.  There

---

[1]

    In light of some of the unproven allegations involving this individual, the Court will use a pseudonym.

is some dispute on whether Milan actually marked each of S.R.'s bathroom visits with a tick mark on a wall calendar. While Quinn-Bonis conceded that Milan did not explicitly state that she was marking the calendar, Quinn-Bonis testified at her deposition that Milan said "'I'm going to tell Dana [Verdecchia, the manager of the Department], you know, how many times she's leaving the room every day,'" and then she put a tick mark on the calendar." Quinn-Bonis Tr. 148:22-149:6 (Feb. 15, 2011).

Although Milan denied at her deposition that she kept track of S.R.'s trips to the bathroom, she recounted that she asked S.R. whether she was "having a problem" because she was "spending a lot of time in the bathroom." Milan explained that it would be difficult to detect or attribute any mistakes if S.R.'s work was finished by another employee. Milan Tr. 65:20-66:4 (Dec. 14, 2010). Eventually, Milan took S.R. to Department manager Dana Verdecchia's ("Verdecchia's") office to discuss the matter. Id. at 63:25-64:25. According to Milan, Verdecchia questioned S.R. who told her she would go see a doctor. Id. at 64:25-65:3. Following this incident, neither S.R. nor Verdecchia made further mention of it to Milan. Id. at 65:11-15.

Several months later, in February 2009, S.R. became very upset at work. Milan Tr. 51:4-9. Milan recounted at her deposition that she was working in the processing room with S.R. and "Chithy," another employee, when S.R. complained that the

4

breeze from an oscillating fan was hitting her in the back. According to Milan, S.R. accused her of having it placed that way deliberately. Milan Tr. 52:5-53:6. S.R. then began to yell and "went ballistic." Id. at 53:4-13. Milan tried to calm her down, reminding her that "this [was] an office space." Id. at 53:11-54:8. When S.R. accused Milan of "always picking on her" and "never [being] happy with her work because she wasn't fast enough," Milan told her "[t]hat's all in your head." Id. at 54:15-55. S.R. then responded "Don't call me crazy." Id. at 55:7-12. Disturbed by the noise, a male employee from another department knocked on the door of the processing room. At that point, Magalhaes came to another door of the room and advised S.R. and Milan to calm down because "people are coming to complain at Donna's[2] office." Id. at 55:14-25.

Verdecchia called Milan, S.R., and Chithy to her office, gave them "a lecture about the behavior," and asked them to explain what had happened. S.R. then started yelling at Verdecchia, who asked S.R. three times to stop yelling because it was "disrespectful." Id. at 56:17-57:13. In the course of the meeting, S.R. accused Verdecchia of "taking [Milan's] side." S.R. then left the office, slamming the door, which prompted Verdecchia to call S.R. back and admonish her about that. Id. at 57:15-23.

According to Milan, after the meeting in Verdecchia's office,

---

[2]  Verdecchia, referred to as "Donna" or "Dana."

other employees told her that S.R. said that if she was getting fired, she was going to kill a couple of people.  Although Milan herself did not hear S.R. make such statements, she informed Verdecchia about them on the following day.  Id. at 58:6-25. Verdeccia called S.R. to her office and S.R. did not return to the Department afterwards.[3]  Id. at 59:18-60:2.

According to Milan, some days later, she was interviewed by a man and woman from the Human Resources Department who questioned her about Verdecchia's ability as a manager and about the incident with the fan.  Id. at 60:3-61:5.  About a month later, on March 17, 2009, Milan was called to the Human Resources Department where she met with Wiggins and Human Resources Performance Consultant Jennifer Pierce-Durot ("Pierce-Durot").[4]  Id. at 71:21-72:8. Wiggins and Pierce-Durot told Milan that her employment was terminated because she "was creating a hostile work environment" and that she was "bullying [S.R.]."  Milan disputed that characterization and told Wiggins and Pierce-Durot that S.R. was

---

[3]

According to Human Resources Assistant Vice President David Wiggins ("Wiggins"), S.R. was taken to the Employee Assistance Program after which she went on long-term leave.  Although a decision was made to terminate S.R.'s employment after her return, she resigned from BCBSRI while on leave.

[4]

Although Milan identifies the person she spoke to as Jennifer Sousa, it appears undisputed that it was Pierce-Durot who, together with Wiggins, conducted interviews in the Department and eventually recommended that Milan's and Magalhaes' employment be terminated. Another co-worker named Cheryl Sousa worked in the Department, which may be the source of the confusion.

"playing them."[5]  Id. at 72:19-73:23.

Milan recounted at her deposition that before these events, she and Magalhaes were repeatedly told by Verdecchia not to speak Spanish at work.  Id. at 78:18-79:14.  According to Milan, she was frequently speaking Spanish with Magalhaes at work "on our breaks" and Verdecchia asked them to stop speaking Spanish "because other people thought that we were talking about them."  Id. at 79:2-19. Verdecchia told Milan and Magalhaes that other people had complained about their speaking Spanish in their "cubes." According to Milan, after Verdecchia instructed them to speak English, she and Magalhaes continued to speak Spanish "[i]n the bathroom" and that, in the work area, they "kept talking Spanish, but very low."  Id. at 80:25-81:7.

B.   Magalhaes's Account

According to Magalhaes, on the day of the fan incident, she was on her way to the ladies' room, when she overheard S.R. saying loudly to Milan: "You are going through fucking menopause. That's why you're so hot."  Magalhaes Tr. 38:4-16 (Dec. 14, 2010).  A male employee from another department got up and asked what was going on.   Magalhaes, surmising that he was going to complain to

---

[5]

According to Milan's deposition testimony, she said to Wiggins and Pierce-Durot:  "If you have known me, you know that I am not capable of bullying anybody," followed by "That is so sad that you two went to school supposedly to discern this, and you guys couldn't figure it out that she lied and played both of you." Milan Tr. at 72:19-24.

Verdecchia, stopped him and told him: "I will go tell my manager to go inside and talk to them." Id. at 38:18-40:5. Magalhaes went to Verdecchia's office and informed her that there was a problem and that Verdecchia had "to go in there." Id. at 40:7-11. Later, Magalhaes observed S.R. slamming the door as she left Verdecchia's office and heard her say "I am going to fucking kill somebody today . . . If I get fired today." Id. at 1:19-42:8. According to Magalhaes, at least three other employees overheard S.R.'s remark. Id. at 42:8-43:8. Although she was frightened, Magalhaes decided not to report her observations because she did not want to be involved and did not want it known that she had reported it. Id. at 52:10-53:1. Instead, Magalhaes told Milan about the incident and later confirmed to Verdecchia what she had overheard. Id. at 53:3-13. After S.R. was placed on leave from the Department, Magalhaes was interviewed by Wiggins and Pierce-Durot for "about ten minutes." Some time after this interview, Magalhaes was told by Wiggins and Pierce-Durot that her employment was terminated because she "caused a hostile environment." Id. at 53:17-55:18.

Magalhaes, whose first language is Portuguese, is also fluent in English and Spanish. She recounted at her deposition that she and Milan were told by Verdecchia to stop speaking Spanish "because people think you are talking about them." Id. at 60:20-22. Magalhaes responded to Verdecchia that she was "not talking about anybody. This is my personal life between me and her." Magalhaes

explained that she spoke Spanish to Milan in order to keep their conversations private and that they talked about "all family matters, personal matters. That was none of my co-workers' business." Id. at 61:10-22. Like Milan, Magalhaes acknowledged that several other co-workers also asked them to speak English. Id. at 62:6-14, 76:3-5.

    C.   Other Accounts

Verdecchia stated that she had never observed Milan or Magalhaes engage in bullying or contributing to a hostile work environment. Verdecchia Tr. 12:17-13:23 (Apr. 19, 2011). She remembered telling Magalhaes to keep her voice down but did not remember prohibiting her or Milan from speaking Spanish or receiving complaints from anyone in the Department about this issue. Id. at 25:2- 26:14. Verdecchia acknowledged that she was sent for "coaching" after the events in February 2009.[6] Id. at 16:1-14.

Co-worker Quinn-Bonis, when interviewed by Wiggins, told him that the office was very uncomfortable when outbursts occurred such as S.R.' slamming the door to Verdecchia's office. Quinn-Bonis Tr. 29:22-30:9 (Feb. 15, 2011). Quinn-Bonis candidly acknowledged that she complained to Verdecchia more than a half dozen times about the

---

[6]

    Wiggins and Pierce-Durot recommended that Verdecchia be placed on a Performance Improvement Plan for 60 days and that she participate in one-on-one coaching "to learn how to effectively manage others." Def.'s Ex. K.

noise level in the office arising from loud conversations between Milan and Magalhaes. Id. at 35:13-25.   Quinn-Bonis, who has "an understanding of Spanish," was not disturbed that Milan and Magalhaes spoke Spanish, only by the loudness of their conversations. Id. at 39:16-40:8. After S.R. left the Department, Quinn-Bonis complained to Verdecchia that Magalhaes, while holding up forms Quinn-Bonis had just processed, loudly commented to the room that "some people only work two days a week around here and there was an expletive in there." Id. at 41:11-43:24. Quinn-Bonis, who called the work environment in the Department "stressful," stated that there was an atmosphere of "bickering" between Milan and S.R. and Magalhaes and S.R., and also included co-worker Elaine Balmer ("Balmer"). Id. at 88:13-89:17. Quinn-Bonis described S.R. as "high strung," and recounted that S.R. had difficulties with several employees over time, including Milan and Magalhaes. Quinn-Bonis said she told Wiggins that Balmer[7] "had a tendency to pick on S.R. . . . play[ed] mindgames with her" and "point[ed] out all of [S.R.'s] mistakes until she crie[d]." Id. at 113:1-9.

Nancy Truex ("Truex"), who also worked in cash receipts at BCBSRI, testified at her deposition that both Milan and Magalhaes "used to speak quite loudly and it was disruptive to the workplace." Truex Transcript 12:12-13 (Apr. 19, 2011). According

---

[7]    Following these events, Wiggins recommended that Balmer be placed on a performance improvement plan for inappropriate conduct and workplace behavior. Def.'s Ex. K 1.

to Truex, Milan and Magalhaes discussed "their personal business" at a loud volume, causing Truex, along with other employees, to complain to Verdecchia about the disruption.  Truex mentioned this to Wiggins in an interview after the incident involving S.R.[8] Although other employees, including Balmer, tended to speak in loud voices at times, Truex stated that "99% of the time it was these two . . . and occasionally it was the others."  Id. at 14:1-7. Truex stated that there existed a rift in the Department between established and new employees.  Id. at 18:12-19:14.  She also stated that Magalhaes had insulted her personally, but that Truex's complaints to Verdecchia fell on deaf ears.  Id. at 19:13-20:14. Truex further described how Milan and Magalhaes "would start a sentence in English and then they would switch to Portuguese, Spanish combination.  And I didn't know what they were saying, but they'd look right at me, so I would assume that they're talking about me, maybe they weren't, they might have been talking about the weather, but I don't know."  Id. at 21:16-22.  According to Truex, Milan and Magalhaes spoke Spanish at work every day, which was disruptive not because they spoke Spanish but because of the constant noise level.  Id. at 21:23-22-15.  With respect to Milan's performance as lead person in the mail processing room, Truex stated that "everything had to be done her way."  Id. at 30:10-19.

---

[8]
Truex herself did not overhear S.R. making any threats or comments in February 2009; she only was told by others what S.R. said.

11

According to Wiggins, he and Pierce-Durot met with S.R. after her dispute with Milan. At the meeting, S.R. made certain allegations "suggesting that inappropriate behavior had occurred within the Department." Wiggins Affidavit ¶¶ 2-14. Wiggins and Pierce-Durot conducted an investigation and interviewed the Department's management and entire staff. Id. at ¶¶ 5-16. Based on those interviews, Wiggins and Pierce-Durot concluded that Milan and Magalhaes "had engaged in a pattern of bullying behavior and created an intimidating, offensive, abusive and hostile work environment within the Department." Id. at ¶ 17. Wiggins and Pierce-Durot recommended that Milan and Magalhaes be terminated from their employment at BCBSRI.[9] Id. at¶ 19. In his affidavit, Wiggins stated that race, national origin, or the fact that Milan and Magalhaes spoke Spanish to each other in the workplace played no role in the decision to terminate their employment. Id. at ¶¶ 23, 24.

Pierce-Durot stated that she recommended to Wiggins, who was her supervisor, to terminate the employment of Milan, Magalhaes, and S.R. Pierce-Durot Tr. 14:8-11, 27:25-28:21 (Apr. 19, 2011). Her recommendation regarding Milan and Magalhaes was based on the interviews conducted with employees of the Department, which led her to conclude that they had caused a hostile work environment.

---

[9] Wiggins and Pierce-Durot also recommended that S.R., who had taken sick leave following the incident with Milan, be terminated from employment upon her return. Id. at ¶ 20.

Pierce-Durot explained that she had learned that Magalhaes "was loud, she made others feel uncomfortable," id. at 29:7-15, and that Milan was alleged to speak loudly and use inappropriate language. Id. at 31:2-19.   According to Pierce-Durot, "[b]ased on the interviews, [Milan] was a workplace bully."   Id. at 31:24-25. Pierce-Durot was aware that Milan and Magalhaes were speaking Spanish at work, and agreed that this was not against company policy. Id. at 33:2-18. Pierce-Durot declared that the fact that Milan and Magalhaes spoke Spanish at work, although it had been a subject of some complaint, was not a factor in her recommendation; instead, she "focused on the behaviors." Id. at 59:2-9. She also acknowledged receiving a number of negative comments about S.R., who had been described as paranoid by some of her co-workers. Id. at 34:6-10.   Following their investigation into the events of February 2009, which included interviewing all employees from the Cash Receipts Department, Wiggins and Pierce-Durot recommended that Milan, Magalhaes and S.R. be terminated and that Verdecchia, Souza and Balmer be placed on a Performance Improvement Plan for 60 days. Defs.' Ex. K.   The executive summary submitted by Wiggins and Pierce-Durot to the Human Resources Department states that, in their professional opinion, "due to specific behaviors that were severe, recurring, and pervasive from co-workers, and the lack of intervention from management, the environment is deemed hostile and has caused relentless stress to [S.R.]." Id.

## II. Procedural History

On June 1, 2009, both Milan and Magalhaes filed a separate charge of discrimination with the Rhode Island Commission for Human Rights and EEOC [United States Equal Employment Opportunity Commission]. Pltfs' Ex. 9, Ex. 14. Milan states that she was born in the Dominican Republic, and "was the only Hispanic in my department." Ex. 9. She charges that, after 15 years employment with an unblemished record, she was terminated after being accused of creating a hostile work environment by her conduct towards S.R. She acknowledged that she had been "informed by our manager that we should not speak Spanish in the workplace, suggesting that another employee might think that we were talking about her." Milan attributes the termination of her employment to her ethnic background and national origin and because she spoke Spanish at work. Ex. 9.

Magalhaes states in her charge that she was born in Portugal and the only Portuguese employee in her department. Ex. 14. She was employed by BCBSRI for approximately 23 years, during which time she maintained an unblemished work record and was never disciplined. Like Milan, she attributes the termination of her employment to her ethnic background and national origin and because she spoke Spanish at work. Ex. 14.

On December 18, 2009, the Commission issued a separate notice of right to sue to both Milan and Magalhaes. On March 12, 2010,

14

the plaintiffs filed suit against BCBSRI under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e *et seq*. Complaint 1. The plaintiffs allege that they were the only two Spanish speaking employees in the Department; that they had been told by their manager not to speak Spanish at work because another employee might think they were talking about her; and that they "were not given the benefit of a reasonable investigation, progressive discipline or other fair process." Complaint ¶ 23. The plaintiffs also allege that BCBSRI "favored the Caucasian/American-born employee, crediting her baseless complaint." Id. at ¶ 24.

The three-count complaint asserts Discriminatory Terms and Conditions of Employment, Retaliation, and Termination, in violation of Title VII (Count I), the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-1 *et seq*. (Count II), and the Rhode Island Civil Rights Act of 1990, R.I. Gen. Laws § 42-112-1 *et seq*. (Count III). Further, the plaintiffs allege Negligent Training and Supervision (Count IV).[10] The plaintiffs' requested relief includes lost wages and benefits, compensation for pecuniary and non-pecuniary losses, attorney's fees, and punitive damages.

---

[10]

In their opposition to the defendant's motion for summary judgment, the plaintiffs indicate that they "intend to withdraw their claim for retaliation and their Count IV (sic) regarding Negligent Training and Supervision." Pltfs' Mem. 2. No stipulation to that effect had been filed as of the date of this Memorandum and Order.

### III. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)(2). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008) (citations omitted). "A fact is material if it has the potential of determining the outcome of the litigation." Id. (quoting Maymi v. Puerto Rico Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008)).

The party seeking summary judgment bears the burden of establishing the lack of a genuine issue of material fact. Merchants Ins. Co. of New Hampshire, Inc. v. U.S. Fidelity and Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998). Once such requisite showing has been made, an opposing party must "present definite, competent evidence to rebut the motion." Martinez-Rodriguez v. Gueavara, 597 F.3d 414, 419 (1st Cir. 2010). The Court, in considering a motion for summary judgment, "read[s] the record in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor." Merchants Ins. Co. of New Hampshire, Inc. v. U.S. Fidelity and Guar. Co., 143 F.3d. at 7 (citing Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997)). In its analysis, the Court ignores any "conclusory

16

allegations, improbable inferences, and unsupported speculation."
Mendez-Aponte v. Bonilla, 645 F.3d 60, 64 (1st Cir. 2011)(citations
omitted).

### IV.  Discrimination based on Race and National Origin

Title VII of the Civil Rights Act of 1964 prohibits the
discrimination against employees with respect to compensation,
terms, conditions, or privileges of employment on the basis of
"race, color, religion, sex, or national origin." 42 U.S.C. §
2000e-2(a)(1)(1982).[11] See Cumpiano v. Banco Santander Puerto Rico,
902 F.2d 148, 153 (1st Cir. 1990)("The inquiry in a Title VII
disparate treatment case is whether the defendant intentionally
discriminated against the plaintiff on the basis of a protected
attribute.")

In their complaint and their respective charges of
discrimination to the Rhode Island Commission for Human Rights and
EEOC, Magalhaes and Milan assert that they believe their employment
was terminated[12] because of their "ethnic background and national

---

[11]

Plaintiffs' claims under FEPA and RICRA are subject to the
same analysis as their Title VII Claim. See Kriegel v. State of
Rhode Island, 266 F.Supp.2d 288, 296 (D.R.I 2003)(applying Title
VII analysis to FEPA and RICRA claims).

[12]

As acknowledged by the plaintiffs, their claims are now
limited to termination based on race and/or national origin,
pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e
et seq., the Rhode Island Fair Employment Practice Act, R.I. Gen.
Laws § 28-5-1, and the Rhode Island Civil Rights Act of 1990, R.I.
Gen. Laws § 42-112-1 et seq.

17

origin...and because they spoke Spanish at work." Complaint ¶ 21, Pltfs.' Ex. Docket Nos. 17-9, 17-14. BCBSRI denies these allegations and asserts that "[a]ll actions regarding Plaintiffs' employment were taken for legitimate, non-discriminatory business reasons." Def.'s Answer 5. BCBSRI also states that it "exercised reasonable care to prevent and correct promptly any alleged discriminatory behavior that may have occurred." Id. at 6. It is undisputed that BCBSRI has adopted a harassment policy that prohibits not only sexual harassment, but all kinds of harassment in the workplace. BCBSRI SUF ¶¶ 29, 30.

The defendant asserts, and the plaintiffs appear to concede, that there is no direct evidence of discrimination against them based on race or national origin. Accordingly, the defendant's summary judgment motion is subject to the McDonnell-Douglas burden-shifting analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to establish a prima facie case for a claim of termination of employment based on race and/or national origin, each plaintiff must first show that (1) she is a member of a protected class; (2) she was adequately performing her job; (3) she suffered an adverse employment action; and (4) her position remained open or her employer replaced her with an employee of comparable qualification. Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir.

2000)(noting that the task of establishing a *prima facie* case of disparate treatment is not onerous).

Establishment of a *prima facie* case by a plaintiff creates a presumption of unlawful discrimination and "the burden shifts to the employer to rebut this presumption by articulating a legitimate, non-discriminatory reason for its adverse employment action." Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d at 19 (citing McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817). If the defendant can meet its burden, "the plaintiff must then show that the defendant's reason is merely pretextual and that defendant intentionally discriminated against him or her." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996)(citation omitted). As noted by the First Circuit, "the burden that shifts to the defendant-employer is only a burden of production, not a burden of persuasion." Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d at 19 n. 1 ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.")(citation omitted).

On motion for summary judgment, "once the employer articulates a legitimate, nondiscriminatory basis for its adverse employment decision, the plaintiff must offer direct or indirect evidence sufficient to show that the employer's decision to discharge him or her was wrongfully based on race or national origin." Ayala-Gerena

19

v. Bristol Myers-Squibb Co., 95 F.3d at 95 (citing <u>Pages-Cahue v.</u>
<u>Iberia Lineas Aereas de Espana</u>, 82 F.3d 533, 536-37 (1st Cir.
1996)); <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 7
(1st Cir. 1990) ("So long as the employer proffers such a reason,
the inference raised by plaintiff's prima facie case vanishes.");
<u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253, 101
S.Ct. 1089, 1093, 67L.Ed.2d 207 (1981)(Burden is on the plaintiff
to demonstrate that "the legitimate reasons offered by the
defendant were not its true reasons, but were a pretext for
discrimination.").

In assessing whether the employer's proffered reason is
pretextual, "a court's 'focus must be on the perception of the
decisionmaker,' that is, whether the employer believed its stated
reason to be credible." <u>Mesnick v. General Elec. Co.</u>, 950 F.2d
816, 824 (1st Cir. 1991). A plaintiff may not "merely . . . impugn
the veracity of the employer's justification; he must elucidate
specific facts which would enable a jury to find that the reason
given is not only a sham, but a sham intended to cover up" the
employer's real discriminatory motive. <u>Id.</u> (quoting <u>Medina-Munoz</u>
<u>v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d at 9 (related to age
discrimination)); <u>Thompson v. Coca-Cola Co.</u>, 522 F.3d 168, 177 (1st
Cir. 2008)(plaintiff had to prove "'not only that the reason
articulated by the employer was a sham, but also that its true
reason was plaintiff's race or national origin.'"(quoting

20

Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d at 19).
Moreover, the First Circuit has stated that "Title VII was not
designed to transform courts into 'super personnel departments,
assessing the merits - or even the rationality - of employers'
nondiscriminatory business decisions.'" Feliciano de la Cruz v. El
Conquistador Resort and Country Club, 218 F.3d 1, 8 (1st Cir.
2000)(quoting Mesnick, 950 F.2d at 825). In other words, it is not
the employer's business judgment that is at issue, but the focus of
the Court's inquiry is "simply whether the given reason was a
pretext for illegal discrimination." Thompson v. Coca-Cola Co.,
522 F.3d at 177. "If there is no proof of discriminatory animus on
the part of a decisionmaker, a plaintiff must show more than that
the decisionmaker's perception was incorrect; he must show that the
'decisionmaker did not believe in the accuracy' of the information
that he was given." Id. (quoting Bennet v. Saint-Gobain Corp., 507
F.3d 23, 31 (1st Cir. 2007)). In other words, the plaintiff "cannot
avert summary judgment if the record is devoid of adequate direct
or circumstantial evidence of intentional racial, ethnic, or
national origin discrimination on the part of [the defendant]."
Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d at 19-20.

**V.  This Case**

Milan and Magalhaes allege that their employment was
terminated "because of their ethnic background and national origin,

21

and because they spoke Spanish at work." Complaint ¶ 21.[13] They support their claim by asserting that, at the time of their discharge, they were the "only employees who were foreign born and of Hispanic/Latin ethnic origin, and the only ones who spoke with a Spanish or Portuguese accent." Pltfs.' Obj. to Defs.' Mot. Sum. Judg. Page 3 of 22. The plaintiffs also state that, although Wiggins concluded that "people in the department 'have broken' [S.R.], . . . the only individuals he terminated were the Plaintiffs, the two employees of Hispanic/Latin origin." Id. In general, Milan and Magalhaes take issue with the quality and manner of Wiggins and Pierce-Durot's investigation and the resulting conclusions and recommendations. Id. at Pages 3 to 11 of 22. Specifically, Milan and Magalhaes point out that, although Wiggins was informed that other, white American-born employees, like Cheryl Souza and Elaine Balmer, had contributed to the friction in the workplace, those employees were not terminated.[14]

In their objection to BCBSRI's motion for summary judgment, the plaintiffs state that, given their long-term "largely

---

[13]

The plaintiffs acknowledge that, "[p]rior to [their] discharge, they had been informed by their manager that they should not speak Spanish in the workplace, suggesting that another employee might think that they were talking about her." Complaint ¶ 22.

[14]

The plaintiffs also repeatedly point out that S.R.'s employment was never terminated, but the record before the Court indicates that Wiggins and Pierce-Durot recommended her termination; however, the termination was rendered unnecessary by S.R.'s voluntary resignation while on leave.

unblemished" tenure, "it can hardly be argued that they were unqualified for their positions or that the duties of their positions are now being performed by individuals with significantly greater qualifications." Pltfs.' Obj. Page 13 of 22.  The Court notes that Milan and Magalhaes have provided no further evidence regarding whether their positions remained open or were filled by persons with similar qualifications.  However, the defendant has not addressed this apparent shortcoming and, instead, assumes "for the purposes of this motion that the Plaintiffs have stated a prima facie case of race or national origin discrimination."  Obj. 11. Therefore, in the context of a summary judgment motion, where all inferences are drawn in the plaintiffs' favor, and "in light of the relatively low threshold showing necessary to establish a prima facie case," Hodgens v. General Dynamics Corp., 144 F.3d 151, 165–166 (1st Cir. 1998), the Court will assume that Milan and Magalhaes have satisfied the requirements for establishing their *prima facie* case.

On its part, BCBSRI has articulated a facially nondiscriminatory reason for the plaintiffs' terminations. According to her own testimony, Milan was informed by Wiggins and Pierce-Durot that she was terminated because she was creating a hostile environment and because she was "bullying" S.R.  Milan Tr. 72:19-15.  Likewise, Magalhaes testified that was told by Wiggins and Pierce-Durot that she was terminated because she caused a hostile environment.  Magalhaes Tr. 55:16-18.  The plaintiffs

assert that "[t]he Employer must produce enough competent evidence, taken as true, to enable a rational fact finder to conclude that there existed a nondiscriminatory reason for the Plaintiff's termination." Obj. Page 15 of 22. This argument, however misstates the defendant's burden, which is one of production only. See e.g. Loeb v. Textron, Inc., 600 F.2d 1003, 1011-1012 (1st Cir. 1979)("McDonnell Douglas leaves the burden of persuasion at all times with the plaintiff, and . . . the employer's burden to 'articulate' a legitimate, nondiscriminatory reason is not a burden to persuade the trier that he was in fact motivated by that reason and not by a discriminatory one."). In this case, it is sufficient that BCBSRI informed both plaintiffs that their employment was terminated because they had caused a hostile work environment.

What remains under the McDonnell Douglas burden-shifting analysis is a determination whether Milan and Magalhaes have demonstrated "at least to the level of trialworthiness," Hodgens v. General Dynamics Corp., 144 F.3d at 166, that BCBSRI's proffered reason for the plaintiffs' termination was a pretext and that they were terminated because of their race and/or national origin. After a careful review of the record submitted by the parties, the Court concludes that the plaintiffs have failed to demonstrate that a reasonable jury could find that their discharges were the result of race and/or national origin based discrimination.

Milan and Magalhaes, although they assert that "[t]he Defendant's reasons for terminating the Plaintiffs are rife with

24

weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions," Pltfs.' Obj. Page 13 of 22, have offered no evidence that BCBSRI's articulated reasons for terminating the plaintiffs were pretextual and that BCBSRI's actual reason for discharging the plaintiffs was race and/or national origin discrimination.

Following the events in February 2009, BCBSRI's Human Resources Department Assistant V.P. Wiggins and Human Resources Performance Consultant Pierce-Durot conducted an investigation of the Cash Receipt Department which included interviews with several employees as well as Manager Verdecchia. As a result of this investigation, Pierce-Durot recommended in a written memorandum dated March 16, 2009 to Wiggins and the Vice President of Human Resources, Eric Gasbarro ("Gasbarro"), that BCBSRI discipline certain employees of the Department, which included termination of Milan, Magalhaes, and S.R. Defs.' SUF ¶ 93. Def.'s Ex. K. Pierce-Durot's memorandum relates allegations of conflicts involving Milan and Magalhaes and statements by S.R. that Milan and Magalhaes "continually picked on her, talked about her, and called her crazy." Def.'s Ex. K. Pierce-Durot also described how she and Wiggins interviewed employees from the Cash Receipts Department and that, after "reviewing the transcripts from the interviews," they concluded that the environment in the Department was "hostile." The memorandum recommends terminating the plaintiffs' employment "for creating an intimidating, offensive, abusive and hostile work

environment." Def.'s Ex. K. BCBSRI now asserts, and the plaintiffs do not dispute, that " [b]ased on those recommendations, BCBSRI terminated Milan's and Magalhaes' employment." Def.'s SUF ¶ 98.

Although the plaintiffs maintain that the record reflects "little, if any, substantive information to substantiate" the assessment that the plaintiffs "engaged in a 'pattern of behavior'" and that BCBSRI "essentially raised no reasons for the termination" other than that the plaintiffs created a "hostile work environment," Obj. Page 18 of 22, plaintiffs offer no evidence that would indicate that BCBSRI disbelieved Wiggins and Pierce-Durot's conclusions. In assessing whether BCBSRI's articulated reason for terminating the plaintiffs' employment was pretextual, the Court's focus "'must be on the perception of the decisionmaker,' that is whether the employer believed its stated reason to be credible." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 41 (1st Cir. 2001) (quoting Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1118 (1st Cir. 1993)). Plaintiffs' perceived flaws of Wiggins and Pierce-Durot's investigation and/or the wrongness of their conclusions and recommendations do not raise a trialworthy issue as to whether BCBSRI reasonably believed that Milan and Magalhaes had engaged in a pattern of behavior that resulted in a hostile work environment.

Plaintiffs are no more successful with regards to the second prong of the final step in the McDonnell Douglas analysis, whether

26

BCBSRI's real reason for terminating the plaintiffs' employment was race and/or national origin discrimination. The plaintiffs argue that BCBSRI "has never articulated why white American born employees who are alleged to have mistreated [S.R.] were treated with more consideration and tolerance than the Plaintiffs." Obj. Page 19 of 22. The plaintiffs also assert that "the total of admissible evidence indicates that [the plaintiffs'] behavior was unobjectionable while the behaviors of others was not." Id. at Page 20 of 22. Plaintiffs' arguments, however, are in direct conflict with the submitted record which reflects that S.R. primarily complained about treatment she received from Milan and Magalhaes and that Milan, in particular, engaged in conduct that Wiggins considered inappropriate, i.e., Milan's close attention to S.R.'s bathroom breaks.[15]

Finally, the plaintiffs suggest that the question of whether Verdecchia, "for some unlawful or discriminatory reason," instructed them not to speak Spanish in the workplace constitutes a trialworthy issue that may constitute evidence of BCBSRI's direct animus towards the plaintiffs. Obj. Page 20 of 22. As both plaintiffs concede, Verdecchia requested that they speak English at work because other co-workers thought Milan and Magalhaes were

---

[15]

Whether or not Milan actually marked on her calendar the number of times S.R. used the bathroom may be in dispute; however, it is evident from Quinn-Bonis' testimony that Milan very publicly drew her co-workers' attention to S.R.'s plight.

27

talking about them. Milan and Magalhaes also concede that they continued to speak Spanish because they wanted to keep their conversations private. Moreover, other co-workers requested that they speak English at work, and several co-workers complained to Verdecchia that they objected to the volume of the plaintiffs' conversations. The March 16, 2009 memorandum makes no mention of this issue and there is nothing to indicate that BCBSRI's decision to terminate the plaintiffs' employment took this issue into consideration. As such, the question of whether Verdecchia (who was not involved in deciding whether the plaintiffs' employment should be terminated) instructed Milan and Magalhaes not to speak Spanish at work for the reasons given falls short of presenting a trialworthy issue.

In sum, none of the plaintiffs' assertions amount to a genuine issue of material fact on the questions of whether BCBSRI's articulated reason for terminating their employment was pretextual or whether BCBSRI's real reason was based on race and/or national origin discrimination. As such, their claims cannot withstand summary judgment.

### Conclusion

For the reasons stated herein, BCBSRI's motion for summary judgment is GRANTED with respect to Counts I, II and III of the Complaint, related to the plaintiffs' termination of employment. Count IV, related to negligent training and supervision, and all retaliation claims asserted in Counts I, II and III are DISMISSED

based on the plaintiffs' voluntary withdrawal.

SO ORDERED.

/s/  Mary M. Lisi

Mary M. Lisi

Chief United States District Judge

September 7, 2011

29